We'll move on to our next case, Lauth v. Covance. Yes, Mr. Betts? Thank you, Your Honor. May it please the Court, my name is Kevin Betts. I'm here on behalf of my client, Mr. Stephen Lauth, who for six years received exceeds expectations or meets expectations and was the highest producing supervisor on the least popular shift with the fewest employees. No doubt he could communicate and no doubt he was a good leader by the admission of even his employer, Covance. Yeah, I mean, he was kind of nasty, wasn't he? No, he was not. Yes, he was. No, that's false. That's false from the record. The 12 people they brought forward on which they terminated him, in fact, he's anything but a nasty person. He's a loyal, honest employee who's the highest producer at that plant. It was only after, and that was the words and quotes of his supervisors when he received the exceeds expectations the year before he was terminated. The only reason he was labeled as nasty is because he complained about the age discrimination and complained about the management above him. So then he was nasty because he was complaining to upper management about his management. So the performance review plan that he was put on was, or performance improvement plan was just wholly pretextual? Well, I'll tell you what was wholly pretextual. That was partially pretextual. Anybody I suppose could improve their communications, even maybe, even the greatest lawyers could improve their communications, the greatest jurists. I'm talking about this case. There was documented problems with his communication skills and his management skills over time. That was the one deficit. He was good on everything else. That was the one deficit that was documented. They put him on the plan. He didn't perform. So you have to show, have evidence that that was wholly pretextual. And what was wholly pretextual is what they fired him for because they were going to give him 90 days. They cut it off at 60 because they came up with a dubious dozen employees who complained about him. When scrutinized, six of those were the secret six because they were the anonymous six who as it turned out, when they finally revealed those six in the final brief to this court on the record where there was no supporting information about the nameless six until the final brief in this court, those individuals had no complaint. And when we asked at the depositions about the other six who were the unsecret six, they said, I don't have any complaint about Mr. Law. So it was wholly pretextual. It was 100% pretextual. Those employees who were deposed had no complaint, even though they said they did. It was a sham termination based on 12 dubious dozen employees, six of whom were anonymous and secret six. The other six were a named unsecret six and when we deposed them, they said, no, I don't have any complaint. And when we deposed their manager who issued the termination, Ms. Walters, she said, I can't remember, but three of them may have been having a complaint. When we checked out what they complained about, they didn't complain about anything. And they had it based on an email that she lost and furthermore, one had a liver disease and she said, well, she did complain to me, but I'm sure the liver disease caused her to forget it. Because when we deposed that employee, that employee said, I can't remember ever making a complaint, but I did have liver disease, which has never been documented by anybody, including Covent, as having anything to do with memory. So that was 100% pretextual and that was 100% the reason for the termination on October 25th, 2012. So this fellow Snyder, his criticisms don't merit any attention at all? He doesn't have any criticisms other than... He doesn't have any criticisms? What do you mean? The defendant's brief is full of his quotations from Snyder. The only quotation... I unfortunately still perceive Steve to be inconsistently willing to reach out and communicate proactively to all his teammates. Because of that, it puts him on an island by himself too many times. And the year... And on and on and on. Well, if I... That's Snyder now. If I may, Your Honor, that was from five years prior to his termination. And the year after that, he was given an exceeds expectations and told he was the best manager and loyal and honest manager he had ever seen. So I guess he solved the problem because he went up in his expectations. He exceeded the expectations the very next year and that met those issues of being put on an island. Part of being on an island was because he ran his shift without anybody's assistance because the 2 o'clock to 10 p.m. shift is not a shift that's very popular, especially for managers. So there was no assistance to him and he ran it all on his own and quite successfully so because if communication was the problem, then the problem must be productivity because he was the highest producing manager all six years. So he must have been doing something right about communications. The only one who was not communicating was a 15-year younger employee who was his comparator who made people cry and that was documented in the hallway and was petulant and indeed nasty and Mr. Loth tried repeatedly to quit interference from Mr. Ellsworth in his team and destroying the team morale but his manager would not do anything about it. And then he threatened him with his age at 59 and retirement. And that is when Mr. Loth put two and two together and said, what's really going on here is age discrimination. I truly reasonably in good faith believe because when you're 59 and you're hit with we may retire you after you just receive an exceeds expectation and praise that any manager would die for and you're told you're going to be retired at age 59 when there's no prospects, there's even more age discrimination in seeking jobs when you're 59 in an employee at will atmosphere than there is usually discrimination on the inside of the company. So this was completely pretextual and it was completely a sham termination. And he was fired when? He was fired October 25, 2012, Your Honor. Now you keep, you kept saying that this fellow Snyder criticized him and then said he was great, but his criticisms and that of Walters and Sturgeon, those were all in 2012. Snyder was not his manager in 2012. He removed himself after the first complaint of age discrimination and the bullying tactics by Mr. Ellsworth. Mr. Snyder removed himself and his boss, Ms. Millie Marsh, who by the way, left the employee of Covance after six months after the complaint was filed in the Southern District Federal Court and destroyed all of her personal files on Mr. Loth. But I understand your point about Snyder having, after having sharply criticized Loth, turned around and said he was great. Well, Mr. Snyder, three years prior, was no longer his manager. Millie Marsh filled in for him. He was his manager all along, who gave him exceeds expectations. But throughout the troubled times of the retaliation against Mr. Loth, Mr. Snyder was not his boss. He was a boss in an entirely different section. But the question is whether his sharp criticisms of Loth are entitled to any weight. Well, they are. And the weight is that the year he gave that, what you call sharp criticism, which he meant Look, they are sharp criticisms. Don't tell me that I'm making up, making them up. I'm not. I'm saying they are sharp criticisms. I'm saying, Your Honor, the very next year, he removed those criticisms by receiving exceeds expectations. But by that time, Loth was gone. No, Loth was not gone by then. You said he was fired in 2012. Snyder was gone, Your Honor, not Loth. You said Loth was, when was Loth, I asked you, when was Loth discharged? October 25th, 2012. You said 2012. Yes. That's the same period in which Snyder was making his criticism. It's wrong. That's not true, Your Honor. That's not supported by the record. What is that? What are you talking about? It's all in 2012. Don't interrupt me. It's all in 2012, isn't it? No. Criticisms and Loth's being discharged. He was employed there in February of 2012. But the criticisms by Snyder are in 2012. No, they are not, Your Honor, with all due respect. Well, they're quoted here as being in, what, they lied about the date? No, they did not, Your Honor. Snyder removed himself from being in management in 2012 after he first made criticism, and Snyder no longer gave any reviews. The last time he gave a review was when he said, look, when are you going to retire at age 59? And that sent shudders through Mr. Loth, but that was their last meeting in the summer of 2011, and Mr. Snyder gave no more comments. And the most recent annual review gave Mr. Snyder, Mr. Snyder gave an exceeds expectation, called him loyal, honest, and hardworking, and the best manager in the entire plant, because he takes the most unpopular period of time, the second shift when no one else wants to work, and they have the fewest employees, and he produces more kits than anybody for six years. When did Snyder say, I unfortunately still perceive Steve to be inconsistently willing to reach out and communicate proactively to all his teammates? That is in 2010, Your Honor. In what year? That was for his performance in 2009. When did Snyder make this comment? I said he made it in 2010 for the year of 2009. The very next year, he made the comment that Mr. Loth was exceeding expectations, and for the sixth year in a row, was the best manager in the entire plant, and he was loyal, honest, and hardworking, and a great leader, and the communication skills no longer showed up at all in the criticism, if any. It was more in the vein of needs room for improvement, that all of us have room for improvement, and no evaluation is perfect, and there was no sharp criticism when he received an exceeds expectation annual review in February of 2011. It was only in the mid-summer of 2011, after Mr. Loth criticized the management for not dealing with the bullying tactics that had brought three people, women in hallways, to tears because of his bullying and mean-spirited behavior that was Mr. Ellsworth, and he was trying to solve the problem and protect his team as any good leader would do, and that is when Mr. Snyder became very nasty with Mr. Loth and said, after he gave him an exceeds expectations, that he was trending toward improvement needed, even though he had not done anything differently other than give a criticism of not handling Mr. Ellsworth, who was a rampant, if I may, Bob Knight of the kit department at Covance, and he was, without limits, the meanest, nastiest employee there, and then he was fired for the dubious dozen, six of whom were unnamed and anonymous. You're in your rebuttal time, you know. Yes. If it pleases the court, I will sit down and rebut. Okay. Thank you, Mr. Lewis. Thank you, Your Honor. Mr. McLaughlin. If it pleases the court, Alan McLaughlin on behalf of Covance. The district court, as we've heard from the characterizations of the record, the district court was required to go through a 40-page analysis of the precedent involved, the applicable law, and the undisputed facts in this case. It did so, ultimately concluding that Louth offered no evidence to raise a reasonable inference that Covance did not honestly have concerns about his communications and his behavior, which resulted in his termination. Throughout his sixth year employment, and we would ask the court to review the record on this rather than my characterization or opposing counsel's characterization, the record is clear that for all six years, five different managers and HR investigators documented, counseled, and or disciplined Mr. Louth for his prior communication, poor communication and management skills. Most instructively and defiantly, Mr. Louth did not ever accept any of that criticism. He didn't acknowledge it. He disputed the criticism from everybody and up until the time of his termination, refused to change his behavior. There are no unique facts or questions of law involved in this case and Covance respectfully requests that this court affirm the Mr. Betz said that Snyder, um, um, repudiated his earlier criticisms. We respectfully disagree and would rely on the record on that point, Your Honor. Each year, while it is clear that the overall ratings may have been meets expectations or even exceeds expectations, his final review prepared by Mr. Snyder at the same time in 2012, this prepared the same time Mr. Snyder prepared all the evaluations for his subordinate supervisors. That was a needs improvement rate and it identified the same type of communication errors that Mr. Louth had displayed throughout his employment. So this would be the January, 2012? That's the mid-year 2012 review. Mid-year, not January. Mid-year, correct. It was, it's consistent with the comments regarding communication that were in the 2011 review, both mid-year and year-end. Right. And that's, that's the one that was done in January of 2012. That's the year-end 2011, which reiterated the same criticisms. Correct, Your Honor. Okay. The termination was straightforward and it's important to look at that timing because it was August of 2012 that Christine Walters, who was the new supervisor, delivered that mid-year 2012 performance management document and also the performance improvement plan. Notably, those were prepared by Mr. Snyder. Snyder prepared those without any knowledge of any EEOC charge that had been filed by Mr. Louth, and that is undisputed. Indeed, Mr. Louth himself testified in his deposition that he expressly acknowledged that he did not believe the PIP had any basis for discrimination based on his age. So even he acknowledges that. Now, after we get that, Covance delivers the mid-year 2012 in August and also the PIP. Ms. Walters consults with Mr. Louth for two weeks and there are no concerns about the PIP. Mr. Louth then goes on vacation for a couple of weeks. It is in late September, 2012 then, and this is critical to learn what happens and the timing of what happened with respect to Mr. Louth. Louth reports to Walters about an incident involving Aaron Ellsworth. Again, this is the age old dispute between two employees and it is Louth who's making the complaint about Ellsworth that Roger Carter, who was not even on Mr. Ellsworth's shift, had had an incident. Walters confirms to Louth that she's aware of that incident. It is being addressed by HR and there's nothing needs to be done. Louth ignores those instructions, decides he'll undertake his own investigation, contacts the employee at issue, contacts the daughter of the employee at issue, involves other employees to the extent that it impacts production. Louth then finally submits his own independent investigation to the HR representative. Now, this is the same HR representative that he had complained about earlier conducting the alert line investigation. He submits that report and doesn't copy his own supervisor. Understandably, she is upset. She meets with him on October 2nd and tells him that he went far outside his purview as the supervisor, that he involved more people than was necessary and indeed he had negatively impacted production. Louth interestingly and consistently says, I would do the same thing again, that I was preparing my record, that I needed to make a record for my own purposes. And one would think, given the fact that he was secretly recording conversations for the past year with all of his supervisors, that he might have a record. But interestingly, there is nothing from those conversations or those tape recordings that are used here. Days later, from October 8th to 17th, Christine Walters, the supervisor, Lisa Britt, another shift supervisor, and Heidi Sturgeon, the HR representative, received eight complaints about loud. They investigated those complaints on October 18th. They meet both those individuals meet with Mr Lau to discuss the complaints consistently and defiantly. Loud to fake defends all of his actions, denies any of those complaints are he wouldn't change. He then tells Sturgeon and Walters that they should investigate 25 to 30 additional employees from his shift to find out what's really going on on the shift. Well, they follow up on that in the next week and they interview five people. Three of them corroborate the earlier complaints. One of them says, I don't have any issue with him, but I know other people do. And the fifth person says, while she originally contacted them with complaints, says, I'm not going to talk to you any further. Based on all those activities, since he'd been issued his PIP, all of these things take place while he is under a PIP. Walters and Sturgeon go to legal department, recommend termination, legal department agrees, and he is terminated. At that point, there again is absolutely no evidence that they did not honestly believe there was a basis for his termination that had nothing to do with his age and had nothing to do with any retaliatory conduct. Again, it's important that we look at the timing of these activities back through the years, it wasn't that Covance was reacting to Louth, it was that Louth was reacting to Covance. If you go back as far as July and August, that's when Snyder delivered the mid-year performance management document noting significant concerns, again, with his communication. It's after he's put on notice about that, that Louth files his alert line complaint about Ellsworth. Second instance, fast forward to January 25th, 2012, HR conducts the alert line investigation. HR instructs Mr. Snyder, yes, we're going to put Ellsworth on a PIP, so they're going to be treated the same as we ultimately learn. But I also want you to counsel Louth because his communication and his activities are not appropriate either. Consistent with HR's recommendation, Snyder does that. Louth then on that very day files his first EEOC charge. So again, it wasn't action by Covance reacting to that charge, it was Louth reacting to Covance. Then we fast forward to August, where Christine Walters delivers both that performance management document noting needs improvement and also places him on a PIP. It's after that, on September 17th, that Louth files his EEOC charge. And then we look at that difference, and counsel can correctly point to it, it was a little over a month from that second EEOC charge to his termination. But as we've detailed, those activities explain that there were different circumstances that very much justified the actions taken by Covance and it had nothing to do with his age, it had nothing to do with his filing of an EEOC charge. So then we're left with the age claim. That analysis is even more straightforward. The only direct evidence they've referred to or comments are the comment by Snyder. Now, again, we would ask the court to refer to the record as to what was said. It is a comment where he inquired in the course of a discussion what Mr. Louth's plans were to retire. There were no threats, there were no accusations, there's nothing other than a question, which this court repeatedly has held is insufficient to show any discriminatory animals. But even assuming it was considered some violent, horrible threat, it occurred back in July 2011, Snyder was not the decision maker, the comment had nothing to do with his termination, it was 15 months before the termination, it simply cannot be evidence of any discriminatory animals. So then we're left with the comparator analysis that's used where we have Aaron Ellsworth versus Mr. Louth. And again, the district court went into great detail to analyze that and say, it's not that they were treated differently. Indeed, they were both put on PIPs. They were both counseled, they were put on PIPs. It is how they reacted and their actions in response to that discipline. Comparator, Mr. Ellsworth receives his performance improvement plan in January 2012, Ellsworth accepts the plan, completes the plan without incident, received no further complaints under that plan. Now, interestingly, he did have another complaint lodged against him in September 2012. Not surprisingly, that complaint again was lodged by Mr. Louth, who was attacking based on this Roger Carter incident. It's also instructive to note that with that incident, no one disputes that incident occurred. Ellsworth self-reported that incident. Ellsworth was counseled and acknowledged his error and Ellsworth apologized to the employee involved. Dramatically different in stark contrast to anything Mr. Louth ever did. Fast forward to his performance improvement plan. Louth refused to accept any responsibility for his conduct. Louth refused to change his conduct. Louth ignored the instructions from his supervisor that he shouldn't conduct any independent investigation into the Carter incident. Approximately a dozen employees complained about Mr. Louth after he's on a PIP. Louth demands further interviews, Covance conducts further interviews. Those interviews find consistent information. Again, we reference the fact that as opposed to Mr. Ellsworth, Mr. Louth was counseled, disciplined, analyzed by five different supervisors and HR representatives, so we cannot point to some discriminatory animus by Mr. Snyder or any other supervisor. Plus, that termination recommendation was reviewed by the legal department. Thus, absent some massive conspiracy, which has not been alleged, it is difficult to understand how there could be any representation that Covance did not honestly believe that they had a sound basis for termination, consistent with and relying upon Mr. Louth's conduct. Unless the court has questions. Okay, thank you very much, Mr. McLaughlin. Mr. Betz? Thank you, Your Honor. With all due respect to Mr. McLaughlin, that is the very nature of a case where management is not coordinated and does not know what the other is doing, and to label it in a pejorative sense as some grand conspiracy, as if Mr. Louth is schizophrenic or something, is ridiculous, and to say that the legal department, which owes a duty to is ridiculous, and it is the height of the retaliation that Mr. Louth underwent at Covance, the individuals, the dubious dozen, did not find consistent results. The only thing they found consistent was that they did not have a complaint about Mr. Louth. Think about it. This man goes for six years as being called loyal, honest, and hardworking, and is the most productive manager. That's where the rubber hits the road for a manager. Who produces the most with the least resources? That was Mr. Louth by all admissions for six years, and then to say in the last 30 days of his PIP, just to put a lid on it and a bow around it, we got 12 people who complained about you. Oh yeah, when we deposed them, they did it. That was the consistent thing about those... So why was he fired? He was fired because he complained. Mr. Snyder, here is another get real moment. Mr. Louth was fired for complaining? Exactly. Well, what's wrong with that? Because he was complaining about... What does that have to do with age? He was complaining about age discrimination, and he did so on three occasions, and it was only after Mr. Snyder... What was the age discrimination? The age discrimination was a good faith, reasonable belief that he was being discriminated against because of two things, fundamentally. One, he was told at age 59, in an at-will world, he needed to know, his boss needed to know, when he was going to retire. That may sound like front stoop chit-chat to some people, but if you're 59 years old and you have to supply resources for your children to go to college, that shouldn't... I don't understand. Why did they want him to retire at 60? The reason is because he was... If I can give a minute of context. Six months prior, he was just told he was a good communicator, and he exceeded their expectations, and then six months later, he was told... You're not answering my question. I'm trying to. No, you're not. Why was he discharged? He was discharged for false reasons that had nothing to do with his legitimate performance, and he was discharged because of retaliatory animus. Please wait and let me finish my question. I'm sorry, Your Honor. What was the advantage to Covance of firing him? Because he was trying to play by the rules of this country. Why would Covance not want him playing by the rules? What was he doing to hurt Covance? Because he pointed out Covance's Achilles heel, that they were 15 years younger, and he got to really demean... Why did Covance want this bully running loose? That's what Mr. Loth said, and he thought it was living in an alternate universe. Well, I'm asking you. Would you let me finish, please? Thank you, Your Honor. What did Covance get out of firing him? They got to take care of their buddy who demeaned women and did what they wanted to do. And Mr. Loth, played by the rules, was an exceptional employee, and he had the credibility to bring down those managers for allowing this 15-year-younger employee to behave like a bully in the block and demean people. And it was documented repeatedly, and he called him on it. And after he received an exceeds expectations and called him on it, he was trending toward a not acceptable performance, which the only thing that occurred differently between his getting an exceeds expectations and good communicator and loyal and honest and hard worker and the best manager in the plant, and six months later was his complaint about a 15-year-younger employee being able to... But just tell me, why does Covance want to fire an excellent employee? Well, that happens all the time in the real world because it's not based always on merit. It's based on the buddy system and based on protecting your back end. If it were a perfect model that it was all merit-based, I would be out of business. But all the time, business... Essentially what you're saying is he was an irritant to them. Yeah, and the irritant was he was trying to follow the rules of age discrimination. Yes, whatever. But that's the reason. What's that? That's the reason you think they fired him. That's the reason I know they fired him. In this legal department, I looked at it, and I said, it's retaliation, just like Covance's legal department. You got your word for it. And your time is up. Okay, well, thank you. Thank you very much to both counsel.